# CHARLESTON.

## WALL v. N. & W. R. R. Co.

Submitted September 5, 1902.   Decided March 21, 1903.

1. RAILROAD—*Rolling Stock—Attachment.*

   Under section 8 of article 11 of the State constitution rolling stock and all other moveable property of a railroad company or corporation are subject to process of attachment, where the attachment is applicable, as well as to ordinary execution. (p. 489).

2. ATTACHMENT—*Contract.*

   The right under attachment of the garnisher as to the garnishee does not by garnishment rise higher than the right of the principal defendant as to the garnishee. When the right of such defendant is subject to a right of the garnishee under a contract between them, the right of the garnisher is likewise subject to the right of the garnishee. (p. 491).

3. RAILROAD—*Garnishment—Contract.*

   One railroad company has an agreement with another by which loaded cars of the one are to be received at connecting points by the other and hauled over its line to the destination of load of the cars, and then be reloaded with other freight by the receiving company on its line, and carried over its line and returned loaded to the railroad of the owner of the cars, the receiving company compensating the owning company for such use of the cars. Such cars cannot be seized under an attachment against the company owning the cars, so as to defeat the rights under such arrangement or contract, of the company receiving and entitled to so use the cars, and a garnishment of the receiving company cannot affect its rights under such arrangements by reason of its possession of such cars. (p. 493).

4. RAILROAD—*Inter-State Commerce—Attachment.*

   A railroad car sent loaded with freight from another state into this state, and to be returned loaded to the former state in the transaction of inter-state commerce, cannot be levied upon under an attachment in this state, nor will another railroad company having such cars in its possession in the process of carrying on inter-state commerce be liable to garnishment by reason of its possession received from another company against which an attachment was issued. This is because of the commerce clause of the national constitution and the inter-state commerce act of Congress. (p. 496).

Appeal and *supersedeas* to the Circuit Court, Jefferson County.

Action by C. F. Wall against Pennsylvania Railroad Company *et als.* Judgment for plaintiff, and defendants appeal.

*Reversed.*

J. M. Mason, Sr., and John W. Daniels, for appelles.

Marshall McCormick, Cleon Moore and Joseph Doran, for appellants.

Brannon, Judge:

C. F. Wall brought an attachment in equity against the Pennsylvania Railroad Company in the circuit court of Jefferson County to recover damages for some cattle killed and others injured while being carried over the line of the defendant in State of Pennsylvania, and sued out an attachment and levied the same on a freight car of said company found at Shepherdstown in Jefferson County, the car being in the possession of the Norfolk and Western Railway Company, and served the attachment also on the latter company as a garnishee on account of its having the car in its possession. The Pennsylvania Railroad Company is a foreign corporation. That company did not appear in the suit; but the Norfolk and Western Company filed an answer, which stands as taken for true and uncontroverted as to its statement of facts. That answer, after stating that both railroad companies are common carriers of goods by railroad, states "that at the time of the issue and service of the writs of attachment herein upon the garnishee and ever since that time, an arrangement and understanding existed between the defendant and garnishee companies, according to the universal custom in such cases among railroad lines throughout the United States in the management of their freight business, by which, instead of unloading and transfering their freight from the cars of one company to the cars of another at a point of connection, each company receives the loaded cars of the other, from and throughout connecting lines or direct, hauls them to the place of destination on its own line, and after discharging the freight under the implied agreement to return them as soon as and when practicable in the due course of business, reloaded

with freight to some point on or near or reached by the line of the company owning them. That under the arrangement and understanding existing as aforesaid the Norfolk and Western Railway Company, the garnishee, had the right to use in its business the cars aforesaid, the cars owned by it while on the lines of the Pennsylvania Railroad Company being similarly in current and constant use of the Pennsylvania Railroad at all times, and each company paying the other, by wheelage or mileage of such cars. The method aforesaid of receiving and returning railroad cars of other lines by railroads facilitates traffic, and is a great accommodation to the shipping public, and has become a part of the general system of freight transportation throughout the United States; that it would be practically impossible for the garnishee to carry on its business with arrangements and understanding of this character with other lines; and that the garnishee, under the arrangements and understanding aforesaid, is entitled, to hold and use as aforesaid the cars for said business free and discharged of and without interference from attachment or garnishment proceedings herein; and that the maintenance of such proceeding would nullify the rights of the garnishee with the defendant under the arrangement and understanding aforesaid, and interfere seriously with the proper movement of traffic and accommodation of the shipping public." The car levied upon had been loaded beyond Hagerstown, Maryland, with sacks of patent plaster consigned to Shepherdstown, and when levied upon was standing upon a side track loaded with plaster to be delivered in said town, according to said bill, and according to the answer was being unloaded when the garnishee was served with the attachment. The case resulted in a decision by the circuit court holding the attachment and garnishment valid, and a decree was rendered against the Norfolk and Western Railway Company for $432.25, on account of its liability by reason of its possession of said car, and company has appealed to this Court.

The question is raised: Is this car subject to attachment? Upon the question whether the property of a *quasi* public corporation essential to its operation is so liable there is much conflict of authority, as will appear from the authorities cited. *Brady* v. *Johnson*, 20 L. R. A. 737; *Gooch* v. *McGee*, 35 Am.

R. 558; *Ammant* v. *New & Co.*, 15 Am. Dec. 593, note 595. All admit that the property of a purely private corporation not serving the general public, though ever so essential to its use, is liable to execution; but as to those corporations created to carry on business valuable to the public, such as a railroad corporation, which is a common carrier, this conflict of cases exists. On the one side it is said that such a corporation would be disabled from performing its public duties, if its property essential in so doing could be seized and sold away from it, and thus the public would suffer great harm. On the other side, to exempt so much property cripples the power of the law to enforce payment of debts, and exempts from its scope a great mass of property. If we say that such property is not wholly free from subjection to debt for the reason that it may be reached by sequestration of earnings, or by the sale of the whole property, the reply is that the ordinary and ready remedy by execution upon judgments is abortive, and that relief is practically denied to small debts. Between these adverse interests the courts have greatly conflicted. All the cases say that unless statute authorizes, the franchise itself cannot be sold under execution, and the major part of legal authority says also that property of such corporations essential to the exercise of such franchise is also not subject to execution. In *Gue* v. *Tide Water Canal Co.*, 24 How. 257, the United States Supreme Court held that a corporate franchise to take tolls on a canal cannot be sold under *fieri facias*, unless authorized by a statute of the state granting the incorporation, and also that the lands or works essential to the enjoyment of the franchise cannot be separated from it and sold under a *fi. fa.* so as to destroy or impair the value of the franchise. So in *East Alabama Co.* v. *Doe*, 114 U. S. 340, it was held that a railroad right of way could not be sold, to any one not owning the franchise, under an execution. Elliott on Railroads, Vol. 2, section 520, says "the franchise of a railroad company, and corporate property essential to the enjoyment of the franchise, are not subject to sale on execution, unless the legislature authorizes or assents to the transfer. But locomotives, cars and other personal property held by the corporation, if not in actual use in the operation of the road, are held by some authorities to be subject to sale on execution, and there seems to be no reason why property

of a railroad corporation not essential to the enjoyment of its franchise should not be subjected to the payment of its debt." Amid the conflict I have concluded that the law is properly stated in 11 Am. & Eng. Ency. L. (2d ed.) 620 as follows: "In the case of corporations such as railroad or bridge companies, which, though not strictly public corporations, are created to serve public purposes, and are charged with public duty, such property as is neccessary to enable them to discharge their duties to the public and effectuate the objects of their incorporation, is not, according to the weight of authority, apart from statutory provision, subject to execution at law. But the property of a *quasi*-public corporation not necessary or not used for the purposes which called the corporation into being is not exempt from seizure or sale under execution." There are some cases which, while admitting that a franchise or things indispensable to its use cannot be levied under execution, yet hold that rolling stock is liable to execution. *Louisville Co.* v. *Boney,* 117 Ind. 501. It thus seems that the franchise itself and everything pertaining to it essential to its operation are exempt from execution, and thus the mater turns upon the question whether railroad rolling stock is so essential. I do not think that the question is tested by whether the property is indispensable in the use of the franchise, but that as put by the case of *Brady* v. *Johnson,* 75 Md. 445, (20 L. R. A. 737), if it is of a nature to be of practical use in the operation of the franchise, rolling stock is essential next to the track or right of way, in fact equally with them. True, rolling stock taken can be replaced, but often this is beyond the ability of the company, and we can easily imagine cases where seizure of rolling stock would stop the performance of public duties. So, I think the common law exempts such rolling stock from execution. The convention which framed our constitution must have been of this opinion when it inserted in article 11, section 8, the provision: 'The rolling stock and all other moveable property belonging to any railroad company or corporation in this State, shall be considered personal property and shall be liable to execution and sale in the same manner as the personal property of individuals." It is argued that this section can have no application to foreign corporations, but only to those chartered by this State. It is a principle which no state can, and therefore no state is presumed to intend to legislate as to persons or things

outside of its territory, and I would be enclined to concur, did it at first concur, in that view; but that would establish a difference between the property of foreign and home corporations found within the territory of the state. And in this connection we must remember that it is a proposition disputed by no one that "a state having property of a non-resident within its territory may appropriate it to satisfy demands of her citizens." *Pennoyer* v. *Neff*, 95 U. S. 714. So I do not see but that the state constitution would make all rolling stock of a railroad company, whether foreign or domestic, liable to execution when found within the State. If that provision of our constitution had no application to property owned by a foreign corporation, then this car would not be leviable; but I think the constitution applies to it.

It is said that this provision of the constitution does not apply for the reason that it makes rolling stock liable to execution only, and not to attachment, as execution is only the end of the law, issuing only upon a judgment, whereas an attachment goes at the opening of the suit, and is only a means to compel the appearance of the defendant. Such was the object of the ancient process of foreign attachment according to the custom of London; but the modern doctrine is that attachment is not for the purpose of bringing the defendant into court, and that its object is to give the plaintiff execution against the thing attached, to seize it, and create a lien upon it conditional upon the rendition of judgment. In this State upon judgment the order is not for another execution, but for sale under the attachment. 3 Am. & Eng. Ency. L. 187; 4 Cyc. 395; 1 Shinn on Attachment, sec. 2. I do not think that it was the intention of the convention to make railroad rolling stock liable to ultimate execution and deny its liability to attachment, as attachment would often be the only process available for prompt seizure to answer ultimate judgment. The object of the section was to do away with the law exempting rolling stock and other moveable properties of railroads and other corporations, and not to discriminate between writs of process.

Is the Norfolk and Western Company liable as garnishee under the circumstances of the case?. It had possession of this car under the circumstances stated in the answer. We must look at the character of the possession. The garnishee held the car

under "an arrangement and understanding between the defendant and the garnishee companies, acording to the universal custom in such cases among railroad lines throughout the United States in the management of their freight business, by which, instead of unloading and transfering their freight from the cars of one company to the cars of another at a point of connection, each company receives the loaded cars of the other, from and throughout connecting lines or direct, hauls them to the place of destination on its own line, and, after discharging the freight, under the implied agreement to return them as and when practicable in due course of business, reloaded with freight to some point on or near or reached by the line of the company owning them." Here is a contract between the two companies vesting the Norfolk and Western Company with a valuable right, which it could carry into effect by reason of its possession of the car, but could not if it was seized and taken from it. The Pennsylvania Company had got the load of plaster from some point on its line, carried it in this car to Hagerstown, where its line connected with the line of the Norfolk and Western, and the latter took up the car and hauled it to Shepherdstown, and in consideration in so doing it had the important right of loading that car, after discharge of the plaster from it, with freight at some point on its own line, hauling it over its own line, earning compensation thereby, and turning it over to the Pennsylvania Company for further transportation. The answer says it paid wheelage for this right. It is needless to endeavor to impress the fact that the use of a car to a railroad company to carry on its business is a valuable use. In short, the garnishee company had a subsistent contract for the possession and use of this car, and it had executed that contract, so far as was to its disadvantage, by haulage to the place to which the plaster was consigned, but had not yet enjoyed that part of the contract most beneficial to it by loading it with freight on some part of its line and earning compensation for its carriage. · It had right to keep the car until it returned it loaded to the Pennsylvania company at Hagerstown, and it could not be levied upon and taken from it to defeat that right because of principles of law that are beyond all question. What is such law? Drake on Attachm., sec. 462, states that law as follows: "It is an invariable rule that under no circumstances shall a garnishee, by the operation

of the proceedings against him, be placed in any worse condition than he would be in, if the defendant's claim against him were enforced by the defendant himself." "A plaintiff by garnishment can not place himself in a superior position as regards a recovery than is occupied by the principal defendant. The garnishee's liability is measured by his responsibility and relation to the defendant. He can be charged only in consistency with the subject of his contract with the defendant." 2 Shinn on Attachm., sec. 516. In *Mills* v. *Steel Co.,* 152 U. S. 619, we find the court saying "the proposition here laid down is in harmony with the generally recognized principle that the rights of the garnisher do not rise above or extend beyond those of his debtor." "The service of the garnishment neither changed nor interrupted the contractual relations existing between the Chicago Company and the St. Louis Company. The right and equities existing and to arise out of those contractual relations, were in no way terminated or defeated by that service." *B. & O. R. R. Co.* v. *McCullough,* 12 Grat. 595, is pointed authority. Also *Neil & Ellingham* v. *Rogers,* 41 W. Va. 37. Therefore we hold that the Norfolk and Western company could not incur liability by the possession of that car. Liability could only arise from possession of it. It did not owe the Pennsylvania company anything. It had the right to use that car, regardless of the levy on it and carry it to Hagerstown and return it to the Pennsylvania company under its contract with that company.

It will not do to say that it could be liable by reason of the ultimate right of the Pennsylvania company to have possession of the car, because the right of the Norfolk and Western would be defeated by the subjection of the car to the attachment—its right to carry the car back to Hagerstown. It would be impracticable, under the circumstances, to subject such reversion. In fact, the court took no steps to ascertain the value of the reversion, as its order shows that it ascertained the value of the car as it stood at Hagerstown, without reference to any idea of reversion, and finding it greater than the demand, gave a personal judgment against the garnishee.

The case of *M. C. R. R. Co.* v. *C. & M. R. R. Co.,* 1, Ill. App. 399, is very pointed in this case to sustain our decision. Loomis brought suit against a railroad company and garnisheed another

having in its possession cars of the debtor company, just as in this case. It was held that "a railroad company is not liable to garnishment for cars received of a connecting line under running arrangements existing between them, such as are usually adopted by connecting lines throughout the country, whereby instead of unloading and transferring their freight from the cars of one company to the cars of the other at the points of connection, each received from the other the cars loaded with freight and hauled them to the place of destination on its own line of road, and after discharging the freight, returned the cars as soon as practicable in due course of business." But it is said that the answer of the company does not set up a contract as actually existing, but relies simply on a universal custom among railroad companies as to such traffic arrangement. This contention cannot be sustained in the face of the fact that the answer affirmatively avers that "an arrangement and understanding existed between the defendant and the garnishee companies." Those words plainly import a perfect contract, because by the agreement and understanding of the parties there is a union of minds upon a specific thing. What if the answer does say that such agreement was according to the universal custom in such cases among railroad lines? That does not destroy the statement that there was an agreement and understanding between the parties to a certain effect; the averment as to custom is surplusage, merely stating that the contract conformed to such custom. Therefore we hold that by reason of the contractual relation between the two companies the car was not attachable, the garnishee was not subject to garnishment and liability. It is argued that there was no contract such as would forbid the Pennsylvania company from taking the car from the Norfolk and Western company at any time. There was that contract; it forbade the Pennsylvania company from taking the car from the Norfolk and Western company. The latter company had the right to do as it did under the contract, that is, take the car to Luray and load it with freight and haul it to the end of its line, and there deliver it to the Cumberland Valley railroad to be carried over that road and delivered to its owner.

It may be thought that if the attachment created a lien on the car conceding the right of the Norfolk and Western, under said contract to carry the car back to Hagerstown, yet the attach-

ment lien still clung to the car and it giving Wall a right superior to the right of the Pennsylvania company, it was the duty of the Norfolk and Western to carry the car back to Jefferson County to be made amenable to the attachment. It is an accepted principal of law that the laws and process of one state have no force outside of that state, and to say that the lien of the attachment clung to the car in its physical absence from the state would seem to violate that principle of law. This lien exists only under the attachment law and process, and is not a contractual lien. It passes no title. Where there is a mortgage or other conveyance passing the title to moveable property, doubtless that title can be asserted in another state so as to recover the property there. So likely will a contractural lien avail' there. How far this doctrine goes is not well settled. Even such mortgages or liens passing title have been held surbordinate to rights acquired in the state to which the property is removed by third person. *Hervey* v. *Locomotive Works,* 93 U. S. 664; *Walwoth* v. *Harris,* 129 U. S. 355; *Corbett* v. *Littlefield,* 22 Am. St. R. 681; *Hornthall* v. *Burwell,* 109 N. C. 10, (13 S. E. 721); *Harrison* v. *Sterry,* 5 *Cranch,* 289, 298; Story on Con. L. sec. 402. These authorities are not cited as pointed on this question, for they involve right of third persons, but are cognate. In our case the rights of no third person had intervened. We do not say whether or not Wall could enforce this lien in another state. If he could not, the lien would end at the state line, and the garnishee having rightfully taken the car to Hagerstown, would be under no obligation to return it. We must pass simply on the rights between Wall and the Norfolk and Western. The company had right to take the car loaded to Hagerstown. It seems clear that at that point it had the right to end its obligation to the Pennsylvania company by delivery of the loaded car to it. It was not under obligations to assume the burden of carrying the car back to Jefferson County. Its contract placed upon it no such burden; on the contrary that contract gave it the right to end its relation with the Pennsylvania company by delivery of the car and thus end its obligation, as the right to end an obligation under a contract is an essential part of the contract. The Norfolk and Western company could not be called upon to unload the car, for that would be a violation of the rights of the shipper in the middle of the transit, and the company could not

be required to haul the load back to Jefferson County, first, because that also would be a great wrong upon the shipper of the load in the car, and second, because it would place a burden upon the Norfolk and Western, which its contract did not put upon it. Thus we cannot see that the garnishee company was under any obligation to return the car.

There is another reason still of very controlling force exempting the garnishee from liability, and that is that clause of the federal constitution giving power to congress to regulate commerce among the states and the act of congress providing "that every railroad company in the United States, whose road is operated by steam, its successor and assigns be and is hereby authorized to carry over its road passengers, freight and property on their way from any state to another state, and to connect with roads of other states, so as to form continuous lines for the transportation of the same to the place of destination." It has been frequently held that the powers of the federal government under said clause of the constitution are exclusive of all power in the state. This power in the national government was held in *Bowman* v. *Chicago,* 125 U. S. 465, and *Railroad* v. *Richmond,* 19 Wall. 584, to be "designed to remove trammels upon transportation between states which had previously existed, and to prevent a creation of such trammels in future, and to facilitate railway transportation by authorizing the construction of bridges over the navigable waters of the Mississippi to reach trammels interposed by state enactments * * *. The power to regulate commerce among the several states was vested in congress to secure equality and freedom in commercial intercourse against discriminating state legislation * * *. So far as these regulations made by congress extend they are certainly indication of its intention that the transportation of commodities between the states shall be free, except where it is positively restricted by congress itself." It would be easy to cite many federal cases to show that any state legislation hindering, obstructing or placing burdens upon inter-state commerce are void, and that no state legislation can be so used or applied as to effect this result. No one can claim that the attachment laws of West Virginia are void under the commerce clause of the Federal Constitution; but that the use of the writ of attachment in this case works a hindrance of the freedom of inter-state commerce; that is, that the

writ is abortive and of no effect, applied as in this case. Any statute or action by state authorities which amounts to a regulation of commerce between the states is void, and if it works obstruction or even retardation of such commerce, it is in law a regulation of commerce. Thus a state tax on telegraph messages beyond the state is void for that reason. *Telegraph Co.* v. *Texas,* 105 U. S. 460. A state act requiring a telegraph company to deliver messages within a mile of the office was held void under the commerce clause. *W. U. Tel. Co.* v. *Pendleton,* 122 U. S. 347. A state statute prohibiting a greater charge for a shorter than for a longer haul was held invalid because it tended to hinder inter-state commerce from the fact that it might prohibit, or operate to prohibit, the railroad from carrying freight from another state at lower rate than it could afford to carry for from points within the state. It worked a consequential effect upon business outside the state. *L. & N. R. Co.* v. *Eubank,* 184 U. S. 27. A steamboat was engaged in navigating a river between two towns in Michigan, but it was in a habit of carrying goods destined for points in another state. The court said that the case related to transportation on navigable waters and further it was unable to draw any distinct line between the authority of congress to regulate an agency employed in commerce between the states, and when it is confined in its action entirely with limits with a single state. Several agencies combining, each taking up the commodity transported at the boundary line at one end of the state and leaving it at the boundary of the other, would not oust the federal power under the commerce clause. *Daniel Ball* v. *U. S.,* 10 Wall. 557. In *Hall* v. *DeCuir,* 95 U. S. 485, it was held that the statute requiring a steamboat to carry colored passengers in the same cabin with white was unconstitutional in requiring those engaged in the transportation of passengers among the states to carry colored passengers in Louisiana in the same cabin with whites was void under the commerce clause. These cases will show that no matter what the form, mode or means by which such commerce is impeded or obstructed, it is void. -4 Elliott on Railroads, sec. 1664. Even the state's power of taxation, large as it is, cannot be exerted on inter-state commerce, because it tends to lessen it and impair it. *Robbins* v. *Shelby County,* 120 U. S. 489. It is true that in order to brand state

law or action as contrary to the Federal Constitution and law the operation of such state law or action must be direct and substantially hurtful to such commerce, not merely remotely hurtful. *L. & N. R. Co.* v. *Kentucky,* 183 U. S. 503. But is not the operation of this writ of attachment a direct impedement and obstruction of inter-state commerce? If this levy is given any effect, it would take the car from the custody of the Norfolk and Western after it had started on its mission of carriage from one state to another, while yet its freight was under its roof and entitled to shelter from the elements and the security of its inclosure. Its transit with its freight had not yet ended when the writ was levied. The protection and security of the plaster were a part of the function of inter-state carriage, and the railroad company and consignee were entitled thereto, just as much as they were entitled to the car for transportation to the point of consignment. Not only so, because that attachment would prevent the Norfolk and Western Company from taking that car to some point on its line, loading it with goods, and hauling it back over its road, and prevent the Cumberland Valley road from hauling in Maryland and Pennsylvania, and prevent the Pennsylvania road from hauling it on to Newark; would prevent those companies from earning freight for such return load and would prevent citizens of West Virginia and another state from the benefit of such car in transporting their goods, and thus deprive them as consignor and consignee from the full enjoyment of the benefit of inter-state commerce. I cannot imagine anything more directly operative on inter-state commerce than attachment so used. The Norfolk and Western railroad company passes from state to state with its line and is engaged in the business of inter-state commerce as held in *Norfolk &c. Railroad* v. *Penn.,* 136 U. S. 114. It is a link and part of lines of railroads affording communication and transportation between different states.

It will not do to say that we can find no act of congress saying that state process shall not be served upon railroad cars running from state to state, and that until there is such act state process can be so used. Powers of the national government were given to it in this commerce matter by the states at the foundation of the government in order that the indispensable transaction of inter-state commerce should be under one

single governmental power for the sake of uniformity, so that it would not be hampered and crippled by the action, the different and diverse and variant action of many states, which would forbid the growth of commerce and prosperity of all the states, and this power in the nation is exclusive. It is well established that "so long as congress does not pass any law to regulate commerce among the states, it thereby indicates its will that commerce shall be free and untramelled." *Brown* v. *Houston,* 114 U. S. 622. The power is exclusive and "the failure of congress to make express regulations indicates its will that the subject shall be free from any restriction or imposition; and any regulation of the subject by the states, except in matters of local concern only, as hereafter mentioned, is repugnant to such freedom." *Robins* v. *Shelby County,* 120 U. S. 489.

I have already said that our state attachment statute is entirely valid, but that it cannot be used in a manner and in cases in which it would operate to infringe upon the exclusive power of the federal government as to inter-state commerce. It may be asked, If this is so, what becomes of that section of the very constitution of this state providing that rolling stock shall be liable to execution? I apply to it the same rule as the attachment law is subject to. Both are subject to the paramount force of the national constitution, as it is an admitted principle that a state constitution can no more detract from the force of federal law than can a state statute. It may be that this ruling will render the application in practice of the provision of the state constitution making the rolling stock of foreign corporations, or even of railroad companies created by the state, very narrow; but if so, it is the result of the force, the paramount force, of the Federal constitution.

For these reasons we reverse the decree of the circuit court and dismiss the plaintiff's suit.

*Reversed.*